**UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| MICHAEL EDWARD COLLIER, EDWARD E. GRAHAM, BISHOP KENNETH R. MURRAY, BRANDON J. DAVID, CHRISTOPHER M. HARTE, HARRY STEPHEN BARTLETT, LINDA CURTIS, B. GLEN WHITLEY, GLENN MOSS ROGERS, CHRISTOPHER C. ASHBY, SCOTT RICHARD MILDER, KELTON GRAY SELIGER, CHARLES FOSTER JOHNSON, ALAN STEELMAN and SARAH STOGNER, | ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Civil No. 26-cv-1574 |
| JANE NELSON, in her official capacity as the Secretary of State of the State of Texas, and DAVE NELSON, in his official capacity as the Deputy Secretary of State of the State of Texas, | ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

**COMPLAINT FOR DECLARATORY AND
PERMANENT INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiff Michael Edward Collier is an Independent candidate for Lieutenant Governor of Texas in 2026.  Collier has twice run for Lieutenant Governor as the nominee of the Democratic Party, first in 2018 when he received 3,860,865 votes and again in 2022 when he received 3,492,544 votes.  Collier also ran for Texas Comptroller as the Democratic Party nominee in 2014 and received 1,742,119 votes. Despite Collier's demonstrated support among the Texas electorate—he received more than 9 million votes in recent elections for statewide office—he almost certainly will not qualify for the ballot in 2026 because the statutory requirements of Texas's unconstitutional Election Code are practically impossible to meet.  To qualify, Collier must submit nomination petitions with 81,030 valid signatures by June 25, 2026.  Under Texas law, however,

Collier was prohibited from gathering these signatures until May 27, 2026, meaning he has only 30 days to do it.  Collier's petitioning period was shortened because there was a primary runoff in his race, and Texas prohibits Independent candidates from petitioning until after the primary election or primary runoff if there is one.  Thus, while other Independent candidates for statewide office have 113 days to gather their 81,030 signatures (which is itself a practically impossible task), Collier has just 30.  This requirement is so burdensome that no Independent candidate for statewide office has ever qualified for the ballot in Texas in a race that had a primary runoff.

2.     Even if Collier had 113 days to gather the required signatures, his burden would still be insurmountable.  No state in the nation requires Independent candidates for statewide office to gather more signatures in less time than Texas, and no other state is even close.  Furthermore, the burden of complying with Texas's requirements has substantially increased over time, because the signature requirement—which is a percentage of the vote for Governor in the preceding election—keeps rising while the time for gathering signatures remains fixed.  In 2004, for example, an Independent candidate for statewide office needed 45,540 valid signatures.  In 2026, by contrast, that same candidate must gather 81,030 signatures in the same amount of time—except for Collier, who has only 30 days, or approximately one-quarter as much time.

3.     Petitioning is inherently laborious and time-consuming work.  It is physically taxing and mentally demanding.  Exceedingly few people have the stamina and skill to do it successfully day in and day out for the length of a petition drive.  Most people also have jobs, domestic duties and other commitments that prevent them from volunteering more than a few hours a day at most.  And petitioning in Texas is far more difficult and inefficient than any other state, because Texas, unlike any other state, prohibits primary election voters from signing nomination petitions, which significantly lowers the number of eligible signers while raising the rate of invalid signatures.

4.      As a result of these factors, it is not possible to rely on volunteers to complete a statewide petition drive in Texas.  No such petition drive has succeeded in Texas in decades, if ever, and history shows one cannot succeed today when Texas's signature requirement is so much higher.  Collier is nonetheless engaged in a petition drive now.  It began on the first day that Texas law permits—May 27, 2026.  On that day Collier's team of volunteer petitioners began gathering signatures and Collier's campaign has already devoted hundreds of hours to the effort as of the first week of petitioning alone.  Collier is also recruiting more volunteers all the time, and he obtained proposals from professional petitioning firms before commencing his petition drive.  One firm quoted a price of $1,605,454.75, and another firm quoted a price of $3,280,320.00.  These price quotes, staggering though they are, are consistent with current market rates.  They also assume the full 113-day petitioning period, and the cost for each firm would increase substantially if the petitioning period were cut short to just 30 days, as it was for Collier.

5.      Recognizing that an all-volunteer petition drive cannot succeed, Collier has also retained Landslide Political, the firm that quoted a price of $1,605,454.75 (based on a 113-day petitioning period), and Collier's campaign is currently paying the firm $30 per validated signature.

6.      Collier's campaign has done internal polling indicating he has strong support among the Texas electorate—so strong that he has a realistic chance of winning the election if he qualifies for the ballot.  Collier also believes his supporters are willing and able to fund his campaign.  But Collier is in an untenable position.  He cannot launch a campaign unless and until he qualifies for the ballot, and to do that he must accomplish what no Independent candidate for statewide office has ever done—meet Texas's excessive signature requirement in just 30 days.  Collier thus must ask his supporters to contribute millions of dollars toward a ballot access effort with a slim chance of success or forego his candidacy entirely.  Yet Collier plainly has

3

demonstrated substantial support among the electorate: he has received more than 9 million votes in recent elections for statewide office.

7.    Collier is joined in this lawsuit by a group of voters who wish to support his campaign and vote for him in Texas's November 3, 2026 general election.  Some are Republicans, some Democrats, and others Independents.  They include: a former Texas State Senator; a former Texas State Representative; a former Texas County Judge; a candidate who sought the Republican Party nomination for Lieutenant Governor in 2018; a District Attorney elected to office as a Republican; a former Dallas Mayor and United States Congressman; another former United States Congressman; a former United States Ambassador; respected members of the clergy; and private citizens who are active in Texas politics.  These voters do not support the Republican or Democratic nominees for Lieutenant Governor.  If Collier is not on the ballot, they will be denied the right to cast their votes effectively.  Yet those who voted in Texas's primary elections are not even permitted to sign Collier's nomination petitions, even if they did not vote for any candidate for Lieutenant Governor, because Texas prohibits primary election voters from signing nomination petitions for Independent candidates.

8.    Texas's prohibition against petitioning until after the primary or primary runoff violates the First Amendment.  *See Meyer v. Grant*, 484 U.S. 414, 421-22, 425 (1988).  Texas's statutory scheme also severely burdens Collier and the millions of Texas voters who wish to support his candidacy, including Plaintiffs, and it is not sufficiently tailored to achieve any legitimate or compelling state interest.  Plaintiffs therefore bring this action against Jane Nelson, the Secretary of State of Texas, in her official capacity, and Dave Nelson, the Deputy Secretary of State of Texas, in his official capacity (together, the "**Secretary**"), to challenge the constitutionality

4

of this statutory scheme.[1]  They assert claims for the violation of their rights to petition, to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law, as guaranteed by the First and Fourteenth Amendments.  Plaintiffs respectfully request that the Court declare the challenged provisions unconstitutional as applied separately and in combination with one another, and permanently enjoin the Secretary from enforcing them.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because the Plaintiffs' claims arise under the First and Fourteenth Amendments to the United States Constitution.

10.      This Court has personal jurisdiction over the Defendants because they are officials of Texas, residing in Texas.

11.      Venue is proper in this Court because all Plaintiffs are residents of Texas and the Defendants are state officials who maintain an office in Austin, Texas.  *See* 28 U.S.C. § 1391(b)(1).

## PARTIES

12.      Plaintiff Michael Edward Collier resides in Harris County, Texas, where he is registered to vote and intends to remain and vote in future elections.  Collier ran for Lieutenant Governor as the Democratic Party nominee twice, in 2018 and 2022, and he ran for Texas Comptroller as the Democratic Party nominee in 2014. Collier received 3,860,865 votes, 3,492,544 votes and 1,742,119 votes, respectively, in those races, totaling more than 9 million votes cast for

---

[1] Plaintiffs understand that Secretary Nelson has announced her resignation, effective July 17, 2026.  Pursuant to Fed. R. Civ. P. 25(d), Secretary Nelson's successor will be substituted automatically as a party to this action.

5

him in recent statewide elections. Collier wants to run for office in future elections in Texas as an Independent, including running for Lieutenant Governor in 2026, but the requirements that Texas imposes upon Independent candidates render that practically impossible—particularly in 2026, when his petitioning period has been shortened to just 30 days. Collier seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Democratic and Republican parties, and he is harmed by the lack of such candidates on Texas's general election ballot.

13.   Plaintiff Edward E. Graham is a retired energy executive. He resides in Travis County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Graham seeks to campaign for, speak and associate with, and vote for Independents and other candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot.

14.   Plaintiff Harry Stephen Bartlett is a Republican former Mayor of Dallas and former United States Congressman. He resides in Blanco County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Bartlett seeks to campaign for, speak and associate with, and vote for Independents and other candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Bartlett voted in Texas's 2026 Republican primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

15.   Plaintiff Bishop Kenneth R. Murray is Senior Pastor of Reach Center Community Church. He resides in Harris County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Murray seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Murray

6

voted in Texas's 2026 Democratic primary, but he did not cast a vote for Lieutenant Governor, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

16. Plaintiff Brandon J. David is a volunteer organizer for the Collier campaign. He resides in Travis County, Texas, where he is a registered voter, and intends to remain and vote in future elections. David seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot.

17. Plaintiff Christopher M. Harte was a top campaign aide for Democrat Mary Frances Tarlton "Sissy" Farenthold's campaign for Governor in 1972, and he served as Finance Chair for Democrat Bob Armstrong's campaign for Governor in 1982. Harte was also the publisher of two Knight-Ridder newspapers and two privately owned newspapers between the 1980s and the 2000s. He resides in Travis County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Harte seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot.

18. Plaintiff Linda Curtis is a member of the League of Independent Voters of Texas, a membership association of Texas Independents who practice "fusion" by supporting candidates of varying partisan affiliations, as well as Independents. She resides in Bastrop County, Texas, where she is a registered voter, and intends to remain and vote in future elections. Curtis seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and she is harmed by the lack of such candidates on Texas's general election ballot. Curtis is also harmed by her inability to vote in Texas's open primary elections and also sign nomination petitions.

19.     Plaintiff B. Glen Whitley is a Republican former Tarrant County Judge. He resides in Tarrant County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Whitley seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Whitley voted in Texas's 2026 Republican primary and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

20.     Plaintiff Glenn Moss Rogers is a Republican former Texas State Representative. He resides in Palo Pinto County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Rogers seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Rogers voted in Texas's 2026 Republican primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

21.     Plaintiff Christopher C. Ashby is a former United States Ambassador who was appointed by President Bill Clinton. He resides in Harris County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Ashby seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Ashby voted in Texas's 2026 Democratic primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

22.     Plaintiff Scott Richard Milder sought the Republican Party nomination for Lieutenant Governor in 2018. He resides in Rockwall County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Milder seeks to campaign for, speak and

associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Milder voted in Texas's 2026 Republican primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

23. Plaintiff Kelton Gray Seliger is a Republican former Texas State Senator. He resides in Potter County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Seliger seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot. Seliger voted in Texas's 2026 Republican primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

24. Plaintiff Reverend Charles Foster Johnson is a pastor who serves as Executive Director of Pastors for Texas Children. He resides in Tarrant County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Johnson seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's general election ballot.

25. Plaintiff Alan Steelman is a Republican former United States Congressman. He served in the White House under President Richard Nixon and was the Republican nominee for United States Senate in 1976. He resides in Dallas County, Texas, where he is a registered voter, and intends to remain and vote in future elections. Steelman seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and he is harmed by the lack of such candidates on Texas's

general election ballot. Steelman voted in Texas's 2026 Democratic primary, and he is harmed by Texas's prohibition against primary voters signing nomination petitions.

26. Plaintiff Sarah Stogner is the Republican elected 143rd District Attorney for Ward, Reeves and Loving counties. She resides in Reeves County, Texas, where she is a registered voter, and intends to remain and vote in future elections. Stogner intends to run for re-election to District Attorney as an Independent in 2028. Stogner seeks to campaign for, speak and associate with, and vote for Independents and candidates running outside the Republican and Democratic parties, including Collier, and she is harmed by the lack of such candidates on Texas's general election ballot. Stogner voted in Texas's 2026 Republican primary, and she is harmed by Texas's prohibition against primary voters signing nomination petitions.

27. Defendant Jane Nelson is the Secretary of State of the State of Texas. The Secretary is the State of Texas's chief elections official and is responsible for administering and enforcing the Texas Election Code, including the provisions challenged herein. The Secretary's business address is Office of the Secretary of State, 400 W. 15th Street, Austin, Texas 78701.

28. Defendant Dave Nelson is the Deputy Secretary of State of Texas. In the Secretary's absence, the Deputy Secretary shall perform the duties prescribed by law to the Secretary of State. Tex. Gov't Code § 405.004. The Deputy Secretary's business address is Office of the Secretary of State, 400 W. 15th Street, Austin, Texas 78701.

## FACTUAL ALLEGATIONS

### I. Relevant History of Ballot Access Regulation in Texas

29. Texas did not adopt an official state ballot, and therefore did not regulate ballot access until 1903. *See* 1903 Tex. Gen. Laws, S.H.B. Nos. 45 and 170, Ch. 101. The original purpose of the official state ballot was not to restrict candidate access, but to protect voter choice

by including all candidates on a single ballot, so that voters could make their selections in private booths, free from harassment and intimidation.  Thus, Texas's 1903 law allowed any political party to place its nominees on the ballot if it submitted them to the Secretary by August of the election year.  *See id.* §§ 85-86, 90.

30.     The 1903 law did not provide a method for Independent candidates to access the ballot.  Texas amended the law in 1905, to allow Independent candidates access if they submitted nomination petitions signed by qualified voters equal in number to "one percent of the entire vote of the State cast at the last preceding general election."  *See* 1908 Tex. Gen. Laws 150 (Terrell Election Law § 94 with amendments through 1908).  The "entire vote" meant the total vote for governor. When that requirement first took effect, in 1906, it translated to 2,802 signatures for statewide office.

31.     Under the 1905 law, parties that polled at least 100,000 votes in the previous gubernatorial election were required to nominate candidates by primary election, and the primary election winners were placed on the general election ballot automatically.  *See id.* §§ 52, 117.

32.     Until 1968, Texas permitted parties that did not qualify to nominate by primary to access the ballot pursuant to the procedure it adopted in 1903 – *i.e.*, by timely submitting a list of their nominees.  In 1968, Texas began requiring such parties to submit nomination petitions and comply with the same 1 percent signature requirement that applied to Independent candidates. TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968).  That year, the requirement translated to 14,259 signatures.

33.     Texas originally offset the cost of its primary elections by charging candidates a filing fee, but in 1972 the Supreme Court declared such fees unconstitutional.  *See Bullock v. Carter*, 405 U.S. 134, 149 (1972).  It found that the fees, which ranged as high as $8,900, gave the primary

elections "a patently exclusionary character." *Id.* at 143-45. Texas thus began using public funds to pay for primary elections in 1972, and has done so ever since.

34.    In 1977, Texas increased the signature requirement for Independent candidates for president by changing it from 1 percent of the prior vote for governor, to 1 percent of the prior vote for president (in Texas). *Compare* TEX. ELEC. CODE ANN. art. 13.45 (2) (West Supp. 1968) *with* TEX. ELEC. CODE ANN. art. 11.01b (West Supp. 1977).

## II.    Current Ballot Access Requirements under the Texas Election Code

35.    The Texas Election Code currently establishes three separate procedural pathways for those seeking access to its general election ballot:

> **"Primary Parties"** select and place their nominees on the general election ballot by means of taxpayer-funded primary elections, *see* §§ 172.001-173.087 (hereinafter, all statutory citations are to the current Texas Election Code, unless otherwise indicated);

> **"Non-Primary Parties"** select their nominees at conventions, but the nominees are not permitted on the general election ballot unless the Non-Primary Party submits precinct convention participant lists and/or nomination petitions signed by the required number of eligible voters, and unless the nominees pay a filing fee or submit nomination petitions, *see* §§ 141.041, 181.001-068;

> **"Independents"** are permitted on the general election ballot only if they submit nomination petitions signed by the required number of eligible voters, *see* §§ 142.001-10, 192.032.

As applied, these separate procedures provide Primary Parties guaranteed access to the general election ballot, at taxpayer expense, but allow Independents and Non-Primary Parties access only if they bear the expense of complying with the burdensome and costly procedures described below.

### A.    Texas Guarantees Primary Parties Ballot Access at Taxpayer Expense, and Has Adopted Electronic Procedures to Minimize the Burden Its Statutory Scheme Imposes on Them

36.    Political parties that received at least 20 percent of the vote in the last gubernatorial election – *i.e.*, Primary Parties – nominate their candidates for state and county government and

the United States Congress by primary election. *See* § 172.001. The winners of each primary election race are designated as the party's nominee, and the nominees are placed on the general election ballot. *See* §§ 172.116; 172.117(a); 172.120(a),(h); 172.122. Since at least 1900, only the Democratic Party and Republican Party have qualified as Primary Parties under § 172.001.

37. The general primary election is held on the first Tuesday in March in each election year. *See* § 41.007(a). Candidates seeking to run in a primary election must submit an application to the state or county chair, depending on the office, in December of the year before the election, and pay a filing fee or submit a nomination petition. *See* §§ 172.021(a),(b); 172.023(a). The filing fees range from a high of $5,000 to a low of $75, depending on the office. *See* § 172.024. Most candidates simply pay the fee, but if they choose to submit a nomination petition instead, their signature requirements are capped at a fixed number, from a high of 5,000 for statewide office, to a low of 500 or less for district, county or precinct offices. *See* § 172.025. In addition, there is no statutory limitation on how early they may start collecting signatures.

38. Although Primary Parties are required to hold primary elections, Texas provides them with start-up funds and reimburses their costs. *See* §§ 173.001-087. Each Primary Party chair submits an itemized statement of estimated costs, which the Secretary "shall approve" provided that the Secretary determines the costs to be "reasonably necessary for the proper holding of the primary election." *See* §§ 173.081-82(b).

39. Since 1972, Texas has spent millions of dollars in public funds to pay for the Primary Parties' primary elections. The Primary Parties use such funds to pay for precinct workers and other elections officials, equipment, transportation, polling place rentals, office rentals, office personnel, office supplies and postage, among many other expenses.

40. Texas has also implemented electronic procedures that minimize the burden on Primary Parties. For example, party chairs are required to submit information to the Secretary

13

about each candidate who applies to appear on the primary election ballot, but Texas enables them to do so electronically.  It also requires the Secretary to maintain an online database of that information, which must be made accessible to the party chairs.  *See* § 172.029(b).  Texas also enables Primary Parties to certify primary election results electronically.  *See* §§ 172.116, 172.117(a), 172.122.

**B.      Texas Allows Non-Primary Parties Ballot Access Only if They Submit Convention Participant Lists or Nomination Petitions Signed by the Required Number of Eligible Voters**

41.      In contrast to the Primary Parties, new political parties and those that did not receive at least 20 percent of the total vote cast for governor in the preceding election – *i.e.*, Non-Primary Parties – must nominate their candidates by convention. *See* §§ 181.002, 181.003, 172.002.

42.      A political party that intends to nominate by convention must register with the Secretary by January 2 of the election year.  *See* § 181.0041.  Candidates who intend to seek the party's nomination must file a notarized application with the party's state or county chair, depending on the office, one month earlier, in December of the year before the election.  *See* §§ 141.031, 172.023(a), 181.031-33.  The nominating conventions are held after the general primary election date, in March of the election year for county, precinct and district offices, and in April of the election year for statewide offices.  *See* §§ 41.007(a), 181.061(a),(b),(c).

43.      A Non-Primary Party may not place its nominees on the general election ballot unless, within 75 days of the precinct convention date, it files precinct convention participant lists with the Secretary that contain participants equal in number to at least 1 percent of the total vote for governor in the preceding general election. *See* § 181.005(a). A precinct convention participant must be a registered voter or resident of the precinct who is eligible to vote a limited ballot, and who has not voted in a primary election or attended the convention of another party in the same election year. *See* §§ 162.001, 162.003, 162.012, 162.014, 181.065, 112.002-04. The participant

14

lists must include each participant's residence address and voter registration number. *See* § 181.005(a).

44. In 2026, the 1 percent requirement imposed by § 181.005(a) translates to 81,030 participants.

45. No Non-Primary Party has qualified for the ballot pursuant to §181.005(a) in at least 50 years.

46. When a Non-Primary Party's precinct convention participant lists lack the required number of participants, Texas provides it with only one alternative method to qualify for the ballot: the party is required to file nomination petitions, within the same 75-day period specified by § 181.005(a), which contain enough valid signatures to make up for the shortfall. *See* §§ 181.006(a),(b).

47. Texas imposes many additional requirements, restrictions and prohibitions that make complying with the requirements imposed by §§ 181.005 and 181.006 more burdensome. Among the most significant are the provisions that prohibit voters from signing nomination petitions until after the primary election, and that render voters ineligible to participate in precinct conventions or sign nomination petitions if they vote in a primary election. *See* §§ 162.001, 162.003, 162.012, 162.014; 181.006(g),(j). These provisions place Non-Primary Parties at a significant disadvantage, by giving Primary Parties a first, exclusive right to solicit voters' support, at a time when Non-Primary Parties are prohibited by law from formally affiliating with them via convention or by obtaining their signatures on a nomination petition.

48. Voters are also prohibited from signing nomination petitions if they participate in another political party's convention in the same year the petition is circulated, or if they previously signed another political party's nomination petition in the same election. *See* §§ 181.006(g)-(h). As a result, by signing a nomination petition, voters forfeit their right to

affiliate with another political party in the same year.  *See* § 181.006(i).  Additionally, voters must include their address, date of birth or voter registration number and, if the relevant jurisdiction includes more than one county, the county of registration, as well as the date of signing and their printed name.  *See* § 141.063(a)(2).  The part of the petition where the signature appears also must contain the circulator's affidavit required by § 141.065, and at the time of signing, the required oath must appear at the top of the page on which the signature is entered. *See* §§ 141.063(a), 181.006(f).

49.    That oath, which petition circulators must point out and read aloud to each potential signer, states as follows:

> I know that the purpose of this petition is to entitle the _____ Party to have its nominees placed on the ballot in the general election for state and county officers. I have not voted in a primary election or participated in a convention of another party during this voting year, and I understand that I become ineligible to do so by signing this petition.  I understand that signing more than one petition to entitle a party to have its nominees placed on the general election ballot in the same election is prohibited.

*See* §§ 181.006(f); 141.064.  Petition circulators also must witness each signature, confirm that the date of signing is correct, verify each signer's registration status and confirm that each registration number entered on the petition is correct before filing the petition.  *See* § 141.064.  In addition, petition circulators must execute an affidavit stating that they complied with the requirements set forth in § 41.064 and believe each signature to be genuine and the corresponding information correct. *See* § 141.065.  The violation of any of the foregoing provisions may invalidate an entire nomination petition or the individual signatures on it. *See* §§ 141.062-063.

50.    Once a Non-Primary Party submits its nomination petitions, the Secretary is not required to certify its nominees for placement on the ballot for approximately two months – or 68 days before the general election.  *See* §§ 142.010(b), 181.007(b), 192.033(b).

16

51.    A Non-Primary Party that succeeds in qualifying for the ballot is entitled to place its nominees on the ballot for one election cycle only, and does not retain ballot access unless at least one of its candidates for statewide office receives at least 5 percent of the vote. *See* § 181.005(b).  In 2019, Texas amended § 181.005 by adding a provision that appears to supersede § 181.005(b), and permits a Non-Primary Party to qualify for the ballot if any of its candidates for statewide office received at least 2 percent of the vote in at least one of the five previous general elections.  *See* § 181.005(c).  A Non-Primary Party that does not qualify to retain ballot access under § 181.005 must repeat the entire process to qualify again in the next election cycle.

52.    Texas further amended its statutory scheme in 2019 to impose an additional requirement on candidates nominated by a ballot-qualified Non-Primary Party.  Specifically, to appear on the general election ballot, such candidates must either pay a filing fee or submit a nomination petition that complies with § 141.062 and is signed by a specified number of eligible voters.  *See* § 181.0311(a) (formerly codified as § 141.041(a)).  The filing fees and signature requirements imposed by § 181.0311(a) are the same as the filing fees and signature requirements imposed on candidates seeking to appear on a primary election ballot for the same office.  *See* §§ 181.0311(a); 141.041(b),(e); 172.024-25.

53.    Section 181.0311 does not specify the following: (1) when signatures may be collected; (2) which voters are eligible to sign; or (3) when the filing fees must be paid or the nomination petitions submitted.  Instead, § 181.0311 provides that the Secretary shall adopt rules as necessary to implement the provision.  *See* § 181.0311(f).

54.    The filing fees required by § 181.0311 are deposited in the state treasury for the general revenue fund, or the county treasury for the county general fund, depending on the office. *See* § 181.0311(c),(d).  When § 181.0311 was enacted in 2019, the Texas Legislative Budget Board

projected that it would have "a positive impact of $230,000 to general revenue related funds through fiscal 2020-21." *See* Texas House Research Organization, *HB 2504 Bill Analysis*, available at https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=86R&Bill=HB2504# (last visited June 2, 2026).

**C.    Texas Allows Independents Ballot Access Only if They Submit Nomination Petitions Signed by the Required Number of Eligible Voters**

55.    The procedure for Independents to qualify for the ballot is similar to that for Non-Primary Parties, except that Independents may not nominate by convention and must submit nomination petitions signed by eligible voters.

56.    Independents seeking state office must file a declaration of intent in December of the year before the election. *See* § 142.002. They also must file an application and a nomination petition that contains valid signatures equal in number to 1 percent of the total vote for governor in the preceding election. *See* §§ 142.004, 142.007. In 2026, that requirement translates to 81,030 valid signatures.

57.    Independents seeking state office must submit their nomination petitions by the 30th day after the primary runoff election day (or after a vacancy in office occurs), but they may not circulate them until after the primary election, or run-off primary election, if there is one. *See* §§ 142.004-06, 142.009, 202.007. Thus, in 2026, Independents seeking state office have either 30 days or 113 days to collect signatures, depending on the outcome of races over which they have no control. This uncertainty alone imposes a significant burden that chills potential candidacies. Further, like Non-Primary Parties, Independents are burdened by the prohibition against obtaining signatures until after the primary election, or primary runoff where applicable, which disadvantages them by giving Primary Parties a first, exclusive right to solicit voters' support at a

18

time when Independents are prohibited by law from formally affiliating with them by obtaining their signatures on nomination petitions.  *See* § 142.009.

58.    Independents' nomination petitions, and the individual signatures on them, are subject to the same requirements and restrictions that apply for Non-Primary Parties, and may be invalidated on those grounds.  *See* §§ 141.062-66.  Further, voters may not sign the petition of more than one candidate for the same office in the same election, and if they do, the subsequent signature is invalid.  *See* § 141.066(a),(c).

59.    Additionally, each page of a petition for an Independent seeking state office must include the following oath at the top, which circulators must point out and read aloud to each potential signer:

> I know the purpose of this petition.  I have not voted in the general primary election or runoff primary election of any political party that has nominated, at either election, a candidate for the office of (insert office title) for which (insert candidate's name) is a candidate.

*See* §§ 141.064, 142.008.

60.    Independent candidates for president also must file an application and nomination petition, which must comply with §§ 141.031(a)(4) and 141.062, respectively, but their signature requirement is equal to at least 1 percent of the total vote for president (in Texas) in the preceding presidential election.  *See* §§ 192.032 (a),(b),(d).  In 2020, this requirement translated to 89,692 valid signatures.  In 2024, it translated to 112,288 valid signatures.

61.    An Independent candidate for president's application must be filed with the Secretary no later than the second Monday in May of the presidential year – the second-earliest filing deadline in the nation – and the petition may not be circulated until after the presidential primary, which in 2024 was held on March 5.  *See* §§ 192.032(c),(g), 41.007(c).  Thus, in 2024, an Independent candidate for president had only 69 days to collect signatures.

62.     Each page of an Independent candidate for president's petition must include the following oath at the top, which the petition circulator must point to and recite aloud to each signer: "I did not vote this year in a presidential primary election." *See* §§ 141.064(1), 192.032(f). A signature on the petition is invalid if the signer signs on or before the presidential primary election or voted in that election. *See* § 192.032(g). Thus, Independent candidates for president are also burdened by the prohibition against formally affiliating with voters, by obtaining their signatures on nomination petitions, until after the Primary Parties exercise their first, exclusive right to seek voters' support.

63.     Texas makes no provision for Independents to retain ballot access.

**III.    Independents and Non-Primary Parties Must Follow Separate Procedures that Require Them to Expend a Massive Amount of Funds and Resources**

64.     In the 123 years since Texas began regulating ballot access, the burden and expense that its statutory scheme imposes on Independents and Non-Primary Parties has increased exponentially. That is because they must collect an ever-increasing number of signatures in the same fixed period of time, and also because Texas's nomination petition procedure itself is obsolete and inadequate for the task. Collecting signatures by hand is inherently time-consuming, labor-intensive and expensive. At each step in the process, the inefficiency of the procedure compounds the severity of the burden of complying with it. The large number of signatures that Texas now requires statewide Independents and Non-Primary Parties to collect in a fixed and limited period of time therefore requires a massive expenditure of funds and resources.

65.     In Texas, a trained petition circulator working diligently under optimal conditions historically could collect 10 signatures per hour, on average, with a validity rate of approximately 70 percent. This translates to a total of 400 raw signatures, or 280 valid signatures, in a full-time, 40-hour work week. Based on those figures, to obtain the required number of valid signatures

20

within the time permitted in 2026, an Independent running for state office must enlist approximately 18 full-time, trained petition circulators if there is no primary runoff, and approximately 72 full-time, trained petition circulators if there is a primary runoff. To comply with its requirements in 2026, a Non-Primary Party will need to enlist approximately 27 full-time, trained petition circulators.

66.     In Collier's current petition drive, however, the difficulty of finding suitable petitioning locations and voters who are eligible to sign petitions because they have not voted in a primary election has significantly lowered the petitioners' efficiency. At present petitioners are averaging between 30 and 50 signatures per 8-hour day, which equates to approximately 4 to 6 signatures per hour.

67.     Volunteer petition circulators are usually unable to work full-time for the entire duration of a petitioning period. Instead, the most dedicated volunteers typically average between 10 and 20 hours per week, while the majority work fewer hours. An all-volunteer petition drive thus will require at least three or four times the number of full-time petition circulators calculated in the foregoing paragraphs, to compensate for the volunteers' part-time availability. As a result, to complete a successful petition drive under Texas's statutory scheme as currently applied, statewide Independents and Non-Primary Parties must, as a practical matter, hire paid petition circulators.

68.     Based on market rates, a successful petition drive in 2020 for an Independent or Non-Primary Party would cost an estimated $882,000. In 2022, the cost was approximately $1.3 million. In 2026, Collier obtained two proposals from petitioning firms. The first, from Landslide Political, totaled $1,605,454.75 and the second, from Free & Equal, Inc., totaled $3,280,320.00. Both proposals were based on the assumption there would be no primary runoff in Collier's race.

21

But because Collier's race did have a primary runoff, thus shortening the petitioning period to just 30 days, both firms would charge substantially more than the price quoted in their proposals.

69.    The high cost of completing a nomination petition drive is a direct function of the ever-increasing number of signatures that Independents and Non-Primary Parties must obtain in the same fixed period of time.  At each step in the process, moreover, from collecting signatures, to reviewing and validating them, to submitting them to the Secretary before the filing deadline, the inefficiency of the nomination petition procedure compounds the burden and increases the cost of complying with it.

70.    Because signatures generally must be gathered outside, in public spaces, inclement weather can make doing so all but impossible on any given day, effectively shortening the petitioning period.  The availability of suitable locations where there is sufficient foot traffic is also limited, because not every public sidewalk is a traditional public forum where protection for the right to petition is at its zenith, and petitioning on private property such as shopping centers is subject to less protection, if any.  Post Offices, for example, are ideal petitioning locations, but many do not allow it.  Further, local officials and property owners are frequently unaware of petition circulators' First Amendment rights.  Consequently, petition circulators are often forced to relocate, losing valuable time in the process, even when they are engaged in First Amendment protected conduct.  All of these factors can lower petition circulators' productivity from the collection rate they achieve under optimal conditions.

71.    Voters who support the right of an Independent or Non-Primary Party to participate in an election are often unwilling to stop in public and provide their signatures and personal information to an unknown petition circulator.  Other potential signers may be confrontational, threatening or abusive.  Additionally, political adversaries or unscrupulous petition circulators can sabotage paper nomination petitions by deliberately signing ineligible or fraudulent names.

72.    The challenges that petition circulators face are exacerbated by the lack of any practical method of confirming, in real time, that potential signers are eligible—that they live in the correct jurisdiction, and that they have not voted in a primary election or signed the nomination petition of another candidate or party.  Petition circulators must nevertheless make a reasonable effort to confirm a signer's eligibility, and later attest to it, which increases the time needed to obtain each signature.  The oath that petition circulators must recite to potential signers adds further delay, and often intimidates or otherwise dissuades voters from signing.  *See* §§ 141.064(1), 142.008, 181.006(f), 192.032(f).

73.    Once signatures are collected, the requirement that petition circulators review them and execute a notarized affidavit attesting that they verified each signer's registration status and believe the signatures to be genuine and the related information correct adds yet another burdensome and time-consuming step to the process.  *See* §§ 141.064-65.  Confirming this information is even more laborious because it is generally gathered on busy sidewalks or public spaces, using a clipboard or another makeshift writing surface, making the hand-writing more difficult to discern.  As a result, many signatures are impossible to verify, making it necessary to collect even more signatures to compensate for those that are illegible.

74.    At the completion of their petition drive, Independents and Non-Primary Parties must obtain their petitions from circulators throughout the state and then review them for compliance to ensure they have enough signatures.  Because the nomination petition form prescribed by the Secretary allows room for only 10 signatures per page, this involves organizing thousands of petition pages in multiple boxes.  Finally, the petitions must be delivered by truck or van to the Secretary's office in Austin.

IV. **Texas's Statutory Scheme Imposes a *De Facto* Financial Barrier Against Independents and Non-Primary Parties Who Seek to Appear on the General Election Ballot**

75. The cost of complying with the ballot access procedures that Independents and Non-Primary Parties must follow functions as a *de facto* financial barrier to their participation in Texas's elections.

76. Since 1972, with few exceptions if any, no statewide Independent or Non-Primary Party has qualified for the Texas ballot except by spending substantial funds to complete a petition drive.

77. Any statewide Independent or Non-Primary Party that completed a successful petition drive since 1972, without spending substantial funds, did so only through a massive mobilization of resources, including but not limited to volunteer labor and food, lodging and travel expenses, all of which have substantial cost. Additionally, dedication of such resources to a petition drive directly detracts from the resources that Independents or Non-Primary Parties can dedicate to their election campaigns, as opposed to their efforts to gain ballot access.

V. **Texas's Statutory Scheme Severely and Unequally Burdens Plaintiffs' Constitutional Rights and Is Presently Causing Them Injury**

78. The financial barrier to entry that Texas's statutory scheme now imposes upon statewide Independents, including Collier, is near-absolute. Collier and his co-Plaintiffs neither possess the funds needed to comply with Texas's statutory scheme as currently applied, nor do they have the ability to raise such exorbitant sums to fund an effort that may not succeed, and which would thoroughly deplete Collier's campaign resources even if it did. Collier's Democratic Party opponent Vikki Goodwin, for example, had raised a total of $767,000.00 to fund her campaign for Lieutenant Governor as of May 16, 2026. That is only a fraction of the amount that Collier must raise just to qualify for the ballot—let alone fund his campaign.

79. Further, in the last 50 years, when substantially fewer signatures were required, any successful volunteer effort to qualify statewide Independents or Non-Primary Parties for the ballot was already an exceedingly rare, isolated incident, which still required a massive mobilization of resources to complete. In 2026, when the signature requirements are five or six times greater than the number needed in 1968, obtaining the required number of signatures in the fixed period of time allowed will be all but impossible without spending huge sums, and even then ballot access is not assured. And for an Independent like Collier, who has only 30 days to collect 81,030 signatures, it will be almost certainly impossible.

80. Collier nonetheless timely filed his Declaration of Intent in December 2025 and commenced his petition drive on May 27, 2026, the first day permitted under Texas law. He and his campaign are now actively engaged in the effort to collect 81,030 signatures by the June 25, 2026 deadline. Collier began with a team of volunteers and his campaign has already dedicated hundreds of hours to the effort as of the first week alone. Recognizing that an all-volunteer effort cannot succeed, Collier has also retained Landslide Political, the professional petitioning firm that submitted a proposal of $1,605,454.75 based on the full 113-day petitioning period, and his campaign is now paying the firm $30 per validated signature. But because a primary runoff occurred for Lieutenant Governor, thus cutting Collier's petitioning period to just 30 days and substantially increasing the cost, the prospect of fundraising for such an effort is itself proving to be a practical impossibility. Collier's supporters are willing to support and donate to his campaign, but Collier cannot raise and spend millions of dollars on a ballot access effort when the historical record demonstrates there is virtually no chance of success within 30 days.

81. By prohibiting petitioning until just 30 days before the deadline for filing nomination petitions, Texas violates Plaintiffs' First Amendment rights. *See Grant*, 484 U.S. at 421-22, 425 ("[T]he circulation of a petition involves the type of interactive communication

concerning political change that is appropriately described as 'core political speech,'" and in such areas, "First Amendment protection[] is 'at its zenith.'"). This outright ban on petitioning, combined with the prohibition against primary election voters signing nomination petitions, compounds the burden on Plaintiffs' rights. The unequal impact of these prohibitions is to give Primary Parties an exclusive statutory right to affiliate with voters before Collier is permitted under Texas law to do so by obtaining their signatures on nomination petitions. Moreover, Primary Party candidates seeking access to the primary election ballot have two full years to collect the small number of signatures they must submit, or can alternatively pay a nominal fee, whereas Independents are limited to the 113-day petitioning period—or in Collier's case, the 30-day petitioning period—prescribed by statute, and they are not permitted to pay a fee in the alternative. Only after Primary Parties have exercised their rights are Independents like Collier permitted by law to affiliate with the remaining voters by obtaining their signatures on nomination petitions.

82. Further compounding the burden is that many of Collier's supporters are Republicans or Democrats who voted in the 2026 primary election. These voters are prohibited from signing his nomination petitions even if they did not vote for a candidate for Lieutenant Governor in the primary. This reduces the pool of voters eligible to sign Collier's nomination petitions and burdens the voting rights of Collier's supporters, including several Plaintiffs, by barring them from supporting his effort to qualify for the ballot unless they forego their right to vote in the primary election—even for offices other than Lieutenant Governor.

83. The prohibition against primary voters signing nomination petitions is significantly broader than necessary to prevent any voter from "casting more than one vote in the process of nominating candidates for a particular office." *American Party of Texas v. White*, 415 U.S. 767, 785 (1974). As a preliminary matter, there is no reason—compelling or otherwise—for the Texas Election Code to preference Primary Party candidates by allowing those candidates to have an

26

earlier opportunity (and the exclusive right) to collect the signatures they need to qualify for the primary election ballot, while requiring Independent and other candidates to wait until the primary elections have been completed.  The interest in ensuring that no more than one vote is cast in the process of nominating candidates for a particular office could just as easily be served if the process were flipped, such that Independent and non-Primary Party candidates had years to collect the signatures they need to qualify for the ballot and Primary Party candidates were prohibited from collecting signatures or receiving primary election votes from individuals who had signed a nomination petition for an Independent or other candidate.  The Election Code therefore unfairly picks winners (Primary Party candidates) and losers (all other candidates) by granting Primary Party candidates early and exclusive access to voters.

84.    In addition, a voter who participated in the 2026 Republican or Democratic primary but did not vote for any candidate for Lieutenant Governor has not cast a vote in the nominating process for that specific office.  Yet Texas bars that voter from signing Collier's nomination petition for Lieutenant Governor.  This overbreadth is not justified by any interest in preventing double-voting in the nominating process, because these voters have not voted for any candidate for the office Collier seeks.  At least one Plaintiff is in precisely this position.  Plaintiff Bishop Murray voted in the 2026 Democratic primary but did not cast a vote in the Lieutenant Governor race.  Under the challenged provisions, Plaintiff Bishop Murray is barred from signing Collier's nomination petition even though he has not participated in the nomination of any candidate for Lieutenant Governor.  The other voter-Plaintiffs are likewise barred simply because they voted in a 2026 primary election at a time when they did not know whether Collier would qualify for the ballot.

85.    By imposing a near-absolute barrier to their participation in its electoral process, Texas's statutory scheme severely burdens Plaintiffs' First and Fourteenth Amendment rights to

27

cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law. Colliers' exclusion from the electoral process prevents him from representing the interests of his voter-supporters within the electoral arena, including Plaintiffs, as well as the interests of all voters who desire more meaningful choices on the general election ballot. It also dissuades voters from supporting Collier and severely harms his ability to fundraise because to many, if not all, potential donors qualifying for the ballot appears to be a lost cause.

86.     Although statewide Independents and Non-Primary Parties have overcome the financial barrier and other obstacles that Texas's statutory scheme imposed in prior elections, no Independent candidate for statewide office has done so in a race with a primary runoff, when the petitioning period is cut to just 30 days. The few successful statewide petition drives in the past occurred when signature requirements were significantly lower than the 2026 requirements, but still severely depleted or exhausted the candidates' or parties' funds and resources and, in some cases, caused them to incur substantial debt. Consequently, these candidates and parties start the general election cycle in a weakened state, with few or no resources to support their campaigns. They are further disadvantaged by the approximately two-month wait until the Secretary certifies them for the ballot, which prevents them from campaigning, fundraising and competing as ballot-qualified contenders during that critical time. In effect, Texas's statutory scheme shortens the general election for Independents and Non-Primary Parties to just 68 days. This additional burden is wholly unnecessary, because the Secretary is authorized to presume the validity of signatures submitted with the proper affidavit and to validate signatures by statistical sample. *See* §§ 141.065(b), 141.069.

87.     Taken together, the combined impact of the severe and unequal burdens that Texas's statutory scheme imposes on Collier and other Independents traps them in a vicious cycle. It requires them to demonstrate voter support to qualify for ballot access, but makes the procedure

for doing so prohibitively expensive. As a result, it compels them to exhaust their resources and focus their strategy on their effort to obtain ballot access, at the expense of campaigning for elective office and other activity that would enable them to build the voter support that Texas requires. Further, Independents are never more than a single election away from the need to qualify all over again, because Texas does not allow them to retain ballot access. Thus, even if Collier qualified for the ballot and won election to the office of Lieutenant Governor, he would still be required to petition for ballot access again as the incumbent in the next election cycle. This cycle eviscerates the ability of Independents to function effectively—if at all—within Texas's electoral arena.

88.    Ultimately, Texas voters, including the voter-Plaintiffs, bear the brunt of its exclusionary ballot access scheme, and each voter-Plaintiff is suffering an injury that is concrete and particularized. Each voter-Plaintiff wishes to vote for Collier for Lieutenant Governor in the November 2026 general election. If Collier is unable to qualify for the ballot—which, for the reasons alleged herein, is almost certain—they will be deprived of the opportunity to vote for their preferred candidate in the general election. This injury is directly traceable to the challenged provisions, which impose requirements that are practically impossible for Collier to satisfy. In addition, at least one voter-Plaintiff, Bishop Murray, is separately injured by Texas's prohibition against primary voters signing nomination petitions, because he voted in the 2026 primary but did not vote for any candidate for Lieutenant Governor. Plaintiff Bishop Murray is willing and eager to sign Collier's nomination petition, but is prohibited from doing so by a provision that is overbroad in its application to him. Several other voter-Plaintiffs are also injured because they voted in the 2026 primary at a time when they did not know whether Collier would qualify for the ballot. These voters are likewise willing and eager to sign Collier's nomination petition, but are prohibited from doing so. The voter-Plaintiffs' inability to support Collier's effort to qualify for

the ballot compounds their injury and independently violates their First Amendment right to petition and associate for political purposes.

89.    None of this comes as any surprise to the Primary Party candidates who benefit from the exclusion of their competition.  As Vikki Goodwin, the Democratic Party's 2026 nominee for Lieutenant Governor recently stated when asked about Collier's candidacy, "He's got to get over 80,000 signatures in order to get his name on the ballot and it can't be anybody who voted in either primary. … I think that's going to be a tough hurdle for him. I really wish he would just throw his support behind me."  *See* The KICK Podcast, *The Lieutenant Governor and Policy*, Episode 5, available at https://www.youtube.com/watch?v=y4I0u31PGSs (last accessed May 26, 2026).  Goodwin knew nothing about the nature of Collier's petition drive nor the funds and resources he might dedicate to it when she made this statement.  She did not need to.  It is well known that Collier faces a practically impossible task.

90.    None of the State's asserted regulatory interests justifies the burdens its statutory scheme imposes on Plaintiffs. The interest in avoiding "frivolous candidacies" is not served by excluding a candidate who has received more than 9 million votes in prior statewide elections and has the active support of former members of Congress, former state legislators, a former county judge, a former United States Ambassador, respected members of the clergy and a sitting District Attorney, among others.  Collier is the very opposite of a frivolous candidate.  The interest in avoiding "voter confusion" is not served by denying voters' right to cast their votes for Collier.  To the contrary, excluding qualified candidates like Collier from the ballot causes voter confusion by denying voters the ability to vote for a candidate they support and compelling them to choose among candidates who do not represent their views.  And the interest in preventing "ballot overcrowding" is not implicated by the addition of a single Independent candidate to the Lieutenant Governor race.  In the 123-year history of Texas's regulation of ballot access, there has

30

never been an overcrowded statewide ballot.  From 1903 to 1967, when Texas did not require Non-Primary Parties to petition, the maximum number of candidates for any statewide office was five.  This fact alone demonstrates that Texas's signature requirements vastly exceed what is needed to prevent overcrowding.

**VI.     Texas's Nomination Petition Procedure Is Not Sufficiently Tailored to Serve Its Legitimate Regulatory Interests, and Less Burdensome Alternatives Are Available**

91.     Texas's nomination petition procedure is not sufficiently tailored to serve its interest in limiting ballot access to candidates who have demonstrated a modicum of public support.  The procedure necessarily excludes those who lack sufficient resources to conduct a successful petition drive, even if they have substantial public support, while providing wealthy candidates and parties a means of gaining ballot access even if they lack the requisite support.

92.     Texas could substantially reduce or eliminate the severe and unequal burdens its statutory scheme imposes on Independent candidates (and Non-Primary Parties) – and specifically the financial burden of complying with its signature requirements – while protecting its legitimate interests, by amending or eliminating many of its provisions.  For example, Texas could eliminate the prohibition against signing nomination petitions before the primary election, thus allowing Independents (and Non-Primary Parties) to compete for voters' support on an equal footing with Primary Parties.  Texas could also allow more time for collecting signatures, by eliminating the starting time, as it has done for candidates seeking access to primary election ballots, and by making its filing deadlines later.  Most obviously, Texas could lower its signature requirements, which are much higher than necessary to protect any legitimate regulatory interest.  Additionally, Texas could allow Independent candidates to qualify for the ballot based on the number of votes they received in a prior election, as it does for both Non-Primary Parties and Primary Parties.

31

93.     Texas could further reduce the burden and expense that its statutory scheme imposes on Independents if it adopted more efficient electronic procedures for them to follow. Arizona, for instance, has implemented a secure online platform that enables voters to sign nomination petitions online, and also confirms their eligibility and validates their signatures automatically.  *See* Arizona Secretary of State Citizens Clean Elections Commission, *E-QUAL*, http://apps.azsos.gov/equal/ (last accessed May 27, 2026).  New Mexico has a similar platform. *See* New Mexico Secretary of State, *Electronic Petitioning*, available at https://www.electronicpetitions.elections.sos.nm.gov/ (last accessed May 27, 2026). Implementation of such a platform in Texas would enable Independents (and Non-Primary Parties) to demonstrate the requisite public support without obliging them to meet tens of thousands of voters in person, in a limited period of time, to obtain their signatures.  It would also enable petition circulators to validate signatures automatically, further reducing the burden imposed by Texas's nomination petition procedure.

## VII.    Texas's Statutory Scheme Is Unconstitutional Under Existing Supreme Court Precedent

94.     Texas's prohibition on petitioning until just weeks before its filing deadline violates the First Amendment.  *See Grant*, 486 U.S. at 422, 425.  Texas's statutory scheme also operates as an exclusionary mechanism that denies voters, including the voter-Plaintiffs, the right to cast their votes for Independent and Non-Primary Party candidates of their choosing.  *See White*, 415 U.S. at 794.  Further, it imposes financial burdens on Independents and Non-Primary Parties that are so great as to be patently exclusionary in character, and therefore discriminates on the basis of wealth. *See Bullock*, 405 U.S. at 143.  It severely burdens Plaintiffs' right to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law, and it is not reasonably tailored to further a sufficiently weighty state interest, given the availability of less burdensome alternatives.  *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v.*

*Takushi*, 504 U.S. 428, 434 (1992).  As applied to Plaintiffs, Texas's statutory scheme is unconstitutional.

## CAUSES OF ACTION

### COUNT I

**(Violation of Plaintiffs' Rights Guaranteed by the First and Fourteenth Amendments)**

95.    Plaintiffs reassert each preceding allegation as if set forth fully herein.

96.    Texas prohibits Independent candidates from petitioning until after the primary election or the primary runoff election, if there is one (§ 142.009).

97.    Section 142.009 is not merely a time-limitation on petitioning but a categorical prohibition on the exercise of First Amendment rights.  For the entire period preceding the primary election or runoff primary, § 142.009 makes it unlawful for Independent candidates to engage in what the Supreme Court has recognized as "core political speech"—the circulation of nomination petitions to express support for a candidacy and to associate with like-minded voters.  *Grant*, 486 U.S. at 421–22.

98.    This prohibition is both content-based and speaker-based: it applies only to speech in support of Independent candidacies, while permitting identical speech in support of Primary Party candidacies throughout the same period.  It is also viewpoint-discriminatory insofar as it suppresses speech advocating political alternatives to the two Primary Parties during the critical months when those parties are actively soliciting voters' support in their primary elections.

99.    As applied to Collier, § 142.009 prohibited him from circulating nomination petitions for approximately five months after he declared his intent to run for office, while the Republican and Democratic candidates were free to campaign and solicit voter support throughout the same period.

33

100.    Texas imposes no restriction on Primary Party candidates' petitioning—they may petition for the full two-year period between elections, but § 142.009 prohibits Independent candidates from petitioning except for the statutorily prescribed period of approximately 113 days or just 30 days.

101.    Section 142.009, as applied separately and in conjunction with the other statutory provisions challenged herein, both causes injury to and violates rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT II

**(Violation of Plaintiffs' Rights Guaranteed by the First and Fourteenth Amendments)**

102.    Plaintiffs reassert each preceding allegation as if set forth fully herein.

103.    Texas imposes a broad array of severely burdensome requirements and restrictions on Independent candidates that seek access to its general election ballot.

104.    Specifically, Independent candidates for statewide office must:

(a)    File a Declaration of Intent in December of the year before the election (§ 142.002);

(b)    Submit nomination petitions within 30 days of the primary runoff election (§ 142.006) or the date on which a vacancy in office occurs (§ 202.007) that contain valid signatures equal in number to 1 percent of the total vote for governor in the last general election, together with notarized affidavits from each petition circulator (§§ 142.007; 141.063; 141.065);

(c)    Circulate nomination petitions that include an oath confirming the signer has not voted in a primary election for a party that has nominated a candidate for the office the Independent candidate is seeking (§ 142.008);

(d)    Point to and recite the required oath to each potential signer before obtaining his or her signature (§§ 141.064; 142.008);

(e)    Start circulating nomination petitions no sooner than the day after the primary election (§ 142.009); and

(f)    Wait until as few as 68 days before the general election for the Secretary to certify their nomination petitions (§ 142.010(b)).

34

105.    The statutory provisions in the preceding paragraph, operating separately and in conjunction with one another, impose substantial or severe burdens on Independent candidates and on voters who support or may wish to support them, which are not justified by any legitimate or compelling state interest.

106.    These provisions, as applied separately and in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT III

### (Violation of Plaintiffs' Rights Guaranteed by the Equal Protection Clause)

107.    Plaintiffs reassert each preceding allegation as if set forth fully herein.

108.    Texas's ballot access requirements for Independents, and specifically those statutory provisions enumerated in Count II of this Complaint, as applied separately and in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the Equal Protection Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

109.    WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Enter a declaratory judgment holding that § 142.009, which prohibits Independent candidates from petitioning until after the primary election or primary runoff election, violates the First Amendment;

B.    Enter a declaratory judgment holding that Texas's statutory scheme regulating ballot access for Independent candidates is unconstitutional as applied to Plaintiffs, and that the following statutory provisions are unconstitutional as applied separately and in conjunction with one another: §§ 141.063; 141.064; 141.065; 142.002; 142.006; 142.007; 142.008; 142.009; 142.010(b); 192.032(a)-(d),(f),(g); 202.007;

C.    Enter an order enjoining the Secretary of State from enforcing the challenged provisions as applied to Plaintiffs;

D.  Award other and further relief as the Court deems proper, including such relief as may be necessary to ensure Plaintiff Collier's placement on Texas's 2026 general election ballot as an Independent candidate for Lieutenant Governor;

E.  Award litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

F.  Retain jurisdiction of this action and grant the Plaintiffs any further relief which may in the discretion of the Court be necessary and proper.

Dated: June 10, 2026                                  Respectfully submitted,


                                                       /s/David P. Whittlesey

Oliver Hall                                            David P. Whittlesey
*Pro hac vice* (motion to be filed)                   State Bar No. 00791920
CENTER FOR COMPETITIVE DEMOCRACY                      **ALLEN OVERY SHEARMAN**
P.O. Box 21090                                        **STERLING US LLP**
Washington, DC, 20009                                 300 West 6th Street, Suite 2250
Email: oliverhall@competitivedemocracy.org            Austin, TX 78701
Tel: +1 (202) 248-9294                                Email: david.whittlesey@aoshearman.com
                                                      Tel: +1 (512) 647-1900

                                                      Michael P. Mitchell
                                                      Christopher Ryan
                                                      Anna Stockamore
                                                      *Pro hac vice* (motions to be filed)
                                                      **ALLEN OVERY SHEARMAN**
                                                      **STERLING US LLP**
                                                      1101 New York Avenue, NW
                                                      Washington, D.C. 20005
                                                      Email: michael.mitchell@aoshearman.com
                                                           christopher.ryan@aoshearman.com
                                                           anna.stockamore@aoshearman.com
                                                      Tel: +1 (202) 683-3800

                                                      ***Attorneys for Plaintiffs***

36